UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

DAMION WILLIAM CLARKE,

              Petitioner,         **No. 6:14-cv-06070(MAT)**
                                  **DECISION AND ORDER**

     -vs-

SUPERINTENDENT OF THE WENDE
CORRECTIONAL FACILITY,

              Respondent.

───────────────────────────────

## I.   Introduction

Represented by counsel, Damion William Clarke ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on the basis that he is in Respondent's custody in violation of his federal constitutional rights. Petitioner is incarcerated pursuant to a judgment of conviction entered September 5, 2008, in New York State County Court, Monroe County (Bellini, J.), following a jury verdict guilty convicting him of Manslaughter in the First Degree (New York Penal Law ("P.L.") § 125.20(1)).

## II.  Factual Background and Procedural History

### A. Petitioner's Trial

#### 1. The Prosecution's Case

On the evening of November 16, 2007, Petitioner, Merlin Sage, and Andrew Mogavero went out drinking at various bars in the City of Rochester. At the last location they visited, Petitioner began conversing with victim Hector Merced in what appeared to be a

friendly manner. Between 1:30 and 2:00 a.m., Merced left the bar with the three men and drove to Miguel Velez's apartment, located at 348 Flower City Park. After they arrived at Velez's apartment, Petitioner and Merced argued. Mogavero related that at some point, Petitioner said words to the effect of, "I've had enough of the disrespect." Mogavero testified that Petitioner then took off his shirt and necklace chains and head-butted Merced. T.268-69.[1] According to Mogavero, after Petitioner head-butted Merced, Merced moved towards Mogavero with his arms out, as if he were going to throw a punch or grab him. To protect himself, Mogavero punched Merced twice in the area of his face and neck. T.270-71.

Mogavero testified that Petitioner, Sage, and Velez then repeatedly punched and kicked Merced, who ended up on the floor. T.271-74. According to Mogavero, Petitioner jumped about 18 inches in the air and stomped on Merced's face and neck with his feet. T.275-76, 313. Petitioner then picked up a "speaker box" and dropped it on Merced's head. T.273, 275. Mogavero watched as Sage urinated on Merced, and Petitioner attempted to defecate on him. By that point, Merced "wasn't moving a whole lot," there was "a lot of blood" on his face and head, but he appeared to be breathing. T.280-81.

---

[1]

Numerals preceded by "T." refer to pages from the transcript of Petitioner's trial, filed by Respondent in connection with his response to the petition (Dkt ## 13-3 & 13-4). Numerals preceded by "SR." refer to the Bates-stamped pages from the state court appellate record, also submitted by Respondent in connection with his response (Dkt ##13-1 & Dkt #13-2).

Assisted by Velez, Mogavero heaved Merced over his shoulder, brought him downstairs, and placed him on a neighbor's porch steps. Mogavero told Velez to call 911. At about that time, Sage appeared by the porch, picked up a mop handle, and struck Merced three times in rapid succession in the area of his face, head and neck. T.285. Mogavero and Sage then fled to Sage's house, where Mogavero changed out of his bloodied clothes.

At about 3:05 a.m., police and ambulance workers responded to the residence next door to Velez's apartment where they found Merced, not breathing and unresponsive. Rochester Police Department ("RPD") officers observed a "ton of blood" on Merced's face, several bruises and visible marks on his upper torso and neck area, as well a boot imprint on his forehead. Near the porch was a broken mop handle with apparent blood on it, as well as scattered pieces from the mop-head.

After speaking with Velez at the scene, the police escorted him to his apartment where they saw a spot that appeared to be blood on the exterior door. On the outside and inside of the front door was a "white haze." Inside the apartment the police saw a bottle of Ajax cleanser by the stereo, and a "white haze kind of material" on the DVD player. On the wall by the stereo and DVD player, there was a small stain of what appeared to be blood within a foot of the stereo speakers, and a very small spot of what appeared to be blood on the wall. T.218-19, 234; 244-45. On the

-3-

apartment floor, the police discovered a key to a Lexus automobile; Petitioner's Lexus was found parked in the lot behind Velez's apartment building.

The autopsy performed by Paul Gosink, M.D. of the Monroe County Medical Examiner's Office ("the ME") indicated that Merced had sustained "a range of blunt force injuries across his body" along with "large collections of injuries externally visible on the neck and the head[,]" including "a lot of bruising all across the left side of the neck, extending from the left ear lobe down toward the base of the neck . . . across the lower left side of the head as well as the left cheek and the forehead," and a broken nose and jaw. T.404. The ME also observed what "looked like a waffle pattern from the bottom of a boot" on Merced's forehead, as well as a "pattern shape of a straight rod, perhaps one inch in diameter" on Merced's body. T.404, 412. Noting the presence of "a large amount of subarachnoid hemorrhage across the surface of the brain," the ME opined that repeated punches and kicks to, or smashing a heavy object on, a person's head, can cause a subarachnoid hemorrhage. Further, hitting a person in the head with a pole after he sustains blows to the head can contribute to a larger subarachnoid hemorrhage. T.429-30, 435-36. The ME testified that, to a reasonable degree of medical certainty, Merced's death was caused by blunt force injuries to the head and neck. T.441.

-4-

On November 19, 2007, Investigator Thomas Cassidy of the RPD met with Petitioner, advised him of his rights, and interviewed him in the presence of his attorney and another RPD officer. Petitioner explained that during a night out with Mogavero and Sage, he met up with "Hec" (Merced), and the four of them went to Velez's apartment at about 2:00 a.m. Petitioner described Merced, whom he had known for about eight years, as a "nasty drunk." T.356. Merced kept displaying his "muscles," and asserted that "his son was going to beat them up." T.356. Petitioner told Merced he had to go, and Merced "got up in his . . . face in a defiant manner[.]" T.356. Petitioner then head-butted Merced, who grabbed Petitioner around the waist, causing them to fall onto a table with a DVD player on top of it. Sage, Mogavero, and Velez began hitting Merced, who fell to the floor. Petitioner told Investigator Cassidy said that he "pulled everybody away" from Merced, at which time Sage urinated on Merced. T.356. Mogavero and Sage then helped Merced up off the ground, who left Velez's apartment on his own power. According to Petitioner, Merced had only "a little blood on his nose." T.356. Mogavero, Sage and Velez then departed. When they returned, Sage and Mogavero "were bragging [to Petitioner] that they had beaten and stomped on Hec [Merced]." T.356. After Petitioner sent them back outside to check on Merced, they returned and reported that Merced "wasn't responsive." T.357. Petitioner told them to call for an ambulance.

-5-

According to Petitioner, a police officer stopped him [when] in the backyard at Flower City Park. Petitioner produced his ID and told the officer that he was just going to a friend's house, and he was permitted to go on his way. T.357. In response to Investigator Cassidy's questions, Petitioner described the clothes and sneakers he was wearing on the morning in question, and said that the clothes were in his bedroom, and the sneakers were on his porch. T.358. After conferring with his attorney, Petitioner stated that he had discarded his clothes in a dumpster in a parking lot near Stonewood Avenue. T.362.[2] When Investigator Cassidy asked him about his sneakers, Petitioner stated that he actually had been wearing boots. T.362. Petitioner responded affirmatively that he had kicked Merced, but only once in the torso and "definitely not in his head or neck." T.363. Petitioner explained that he had burned his boots in a fire. He later took Investigator Cassidy to the backyard of a home in the Town of Hamlin where the investigator found "a couple chunks of what appeared to be [burnt] rubber and some eyelets[,]" "similar to what would be in a pair of shoes." T.362, 364-67.[3]

---

[2]

Investigator Cassidy went to the parking lot at Stonewood Avenue, but the dumpster had been emptied by the time he arrived. T.368-69.

[3]

Defense counsel was permitted to ask Investigator Cassidy if Petitioner had told him that he burned his boots because he was afraid of being arrested on a violation of probation. Investigator Cassidy responded, that Petitioner "may have said during—at some point during it that he was afraid of having his probation violated. I don't remember. I don't remember if he was on probation, but I don't think that ever came up." T.384.

-6-

Petitioner explained that he had disposed of his clothing and boots because he was afraid of being arrested on a probation violation.

## 2. The Defense Case

Velez, who had known Petitioner for three months prior to the incident at issue, testified for the defense. On November 17, 2007, Petitioner, Sage, Mogavero, and Merced arrived at his apartment "a little drunk[,]" and Merced started "acting weird" by "swinging punches" and "making threats." T.490. Petitioner then head-butted Merced, and when Merced "stumbled," Mogavero and Sage "jumped" on Merced and punched him. T.490, 518. Merced stumbled onto a table and ultimately ended up on the floor. T.518. Petitioner told the group "to stop" what they were doing. Velez announced that he wanted Merced out of his house. T.491. Velez helped Merced up, and Merced walked out of the apartment. According to Velez, he did not see anyone jump or stomp on Merced's head or hit him in the head with a speaker while they were all in Velez's apartment. T.491. Other than "stumbling a little bit" and "bleeding a little bit" from his nose, Merced "was fine" when he left the apartment. T.520.

After Merced left, Sage said that he wanted to "get him[,]" so Sage and Mogavero departed. T.492. Petitioner told Velez to "follow them" "to make sure they don't do anything stupid." T.492. Outside Velez's apartment building, Velez saw Sage strike Merced "repeatedly" with a mop handle, causing it to break. T.493.

Mogavero then "jumped" up and "stomped" on Merced's head. T.492, 522.

Meanwhile, neighbor Shannon Manza, who lived at 350 Flower City Park, heard "a lot of noise" outside her home at about 2:00 or 2:30 a.m. She testified it sounded like a "two by four" hitting something, and she also heard a "moaning sound." When Manza looked out her window, she saw two "kind of tall and skinny" people with hoods on, carrying "a Spanish guy," as well "a shadow" of a third person. T.454, 463-65. One of the men had a stick in his hand. T.464-65. Another of the men "stomp[ed]" on "the Spanish guy's" head with "what looked like Timberland boots." T.465. The people who were attacking the Spanish guy looked up at Manza's window, and then ran away, leaving their victim. T.466-67. On cross-examination, Manza testified that when she spoke to the police shortly after the incident she said that she saw only two men and that one man had a pole in his hand. She also testified that she had not told the police that she had seen anyone stomp on the victim. T.477.

After Merced's beating, Velez called 911, reporting that five black males with hoodies were beating a man with a baseball bat. T.492, 494-95, 500. When the police arrived, Velez spoke with the officers in a patrol car and then returned to his apartment, where he attempted to clean the DVD player and the table with Ajax. T.509. He also cleaned a knob to the apartment's entrance door.

T.508-09. On cross-examination, Velez testified that he had told the police he saw five males, one of whom was black, kicking Merced. T.505.

### C.   The Verdict and Sentence

The jury returned a verdict finding Petitioner not guilty of second-degree murder and guilty of the lesser-included offense of first-degree manslaughter. T.614. Petitioner was sentenced, as a second felony offender, to a determinate prison term of 25 years, plus 5 years of post-release supervision.

### D.   Post-Conviction Proceedings in State Court

Petitioner filed a pro se motion to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10 in the trial court on August 19, 2008. SR.1-35. Petitioner argued that trial counsel was ineffective because he failed to investigate and present allegedly exculpatory evidence. In an order dated January 5, 2009, the trial court denied vacatur. SR.41-46. Petitioner's motions to renew and for leave to appeal were denied.

Through appellate counsel, Petitioner pursued a direct appeal of his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. SR.96-191. Petitioner argued that trial counsel was ineffective because he did not request a jury charge on accomplice testimony with regard to Mogavero; the verdict was against the weight of the evidence; and his sentence was harsh and excessive. On December 21, 2012, the Appellate Division

-9-

unanimously affirmed the judgment of conviction. <u>People v. Clarke</u>, 101 A.D.3d 1646 (4th Dep't 2012). On March 11, 2013, the New York Court of Appeals denied leave to appeal. <u>People v. Clarke</u>, 20 N.Y.3d 1097 (2013).

 **E. The Federal Habeas Petition**

 Petitioner timely filed a <u>pro</u> <u>se</u> petition for a writ of habeas corpus asserting the same three issues that he raised on direct appeal. On October 30, 2014, Brian Shiffrin, Esq., appeared on Petitioner's behalf and submitted a memorandum of law, withdrawing the non-cognizable weight-of-the-evidence and sentencing claims. Petitioner's sole remaining habeas claim is that trial counsel was ineffective because he did not request that the court instruct the jury to consider whether Mogavero was an accomplice as a matter of fact, and if so, whether his testimony was sufficiently corroborated.

 Respondent filed a memorandum of law in opposition to the petition, conceding exhaustion and arguing that the ineffective assistance claim is without merit. Petitioner did not file a reply brief. For the reasons discussed below, Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed.

**IV. General Legal Principles**

 The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Petitioner's petition, filed in 2014. AEDPA "revised the conditions under which federal courts may grant habeas

relief to a person in state custody." <u>Kruelski v. Conn. Superior</u> <u>Ct. for Jud. Dist. of Danbury</u>, 316 F.3d 103, 106 (2d Cir. 2003) (citing 28 U.S.C. § 2254). Under AEDPA, a federal court may grant a writ of habeas corpus under 28 U.S.C. § 2254 only if the state court's adjudication of the petitioner's claim on the merits ruling is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or involved an "unreasonable determination of the facts" in light of the evidence presented, 28 U.S.C. § 2254(d)(2).

## V.   Merits of the Petition

### A.   Overview

During the charge conference, trial counsel requested a jury instruction regarding "motive to fabricate" with respect to Mogavero, who had been called by the prosecution to testify at Petitioner's grand jury proceeding and was not charged with any crimes related to Merced's death. Defense counsel argued that there was "evidence in the case that Andrew Mogavero may have had a reason to testify falsely, to put the blame on my client in this case, and that I did mention it before in selecting the jury. I think we should get that charge." T.531. Trial counsel also requested an instruction with regard to Mogavero receiving a benefit for his testimony. The first request was granted, and the second was denied. T.531-32.

Shortly thereafter, the trial judge asked counsel if there was any request for instructions on "accomplice as a question of fact" or "accomplice as a matter of law." Trial counsel replied that he did not want either of those instructions given. The trial court noted, "All right. So then, accomplice, you can disregard that, that doesn't come in." T.537-38.

**B.   The State Court's "Adjudication on the Merits"**

On direct appeal, the Fourth Department summarily rejected Petitioner's contention that he was denied the effective assistance of counsel based on defense counsel's failure to request that the jury be charged with deciding whether Mogavero was an accomplice as a matter of fact, and if so, whether his testimony was sufficiently corroborated. After citing generally to the New York State standard for adjudicating ineffective assistance claim, People v. Baldi, 54 N.Y.2d 137, 147 (1981), the Fourth Department held that even assuming an accomplice charge was warranted, "there was substantial corroboration for the accomplice testimony," and Petitioner "would have derived no benefit from an accomplice charge[.]" Clarke, 101 A.D.3d at 1647 (quotation omitted). The court reasoned,

> Because "'the failure of [the County Court] to give [an accomplice charge] is of no moment [where, as here,] the testimony of the witness was in fact amply corroborated'", defense counsel was not ineffective for failing to request such a charge.

Clarke, 101 A.D.3d at 1647 (internal citations and quotations omitted; alterations in original).

Although the last-reasoned decision on this claim only applied Baldi, a State law case, the claim nonetheless was "adjudicated on the merits[,]" 28 U.S.C. § 2254(d), such that this Court's review of the claim is governed by AEDPA. See, e.g., Lynn v. Bliden, 443 F.3d 238 (2d Cir. 2006) (AEDPA's "standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.") (citations omitted).

### C.   Clearly Established Federal Law

"There is no dispute that the clearly established federal law here is Strickland v. Washington[, 466 U.S. 668 (1984)]." Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011). To succeed under Strickland, a petitioner must demonstrate both (1) objectively unreasonable performance by trial counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 687–88, 694. The Supreme Court has acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. at 689; accord, e.g. Cullen, 131 S. Ct. at 1402. A reviewing court must refrain from "second-guess[ing] counsel's assistance after conviction or adverse sentence[,]" Strickland, 466 U.S. at 689, and is to confine itself to asking "whether an attorney's

-13-

representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Strickland, 466 U.S. at 690).

**D.   Analysis**

**1.   The "Deficient Performance" Prong**

Generally speaking, a petitioner "will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if 'there [was] no . . . tactical justification for the course taken.'" Lynn, 443 F.3d at 247 (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam); citing Strickland, 466 U.S. at 689 ("[[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks and citations omitted)).

Although trial counsel could have asked for an accomplice-in-fact instruction, he made a strategic decision not to request that jury charge, see Part , supra (citing T.537-38). This decision was reasonable in light of trial counsel's argument that Petitioner merely "head-butted" Merced and kicked him once in the torso, and that Mogavero and Sage had inflicted the injuries that caused Merced's death. To that end, trial counsel elicited the ME's opinion that "people don't usually die" from being head-butted. T.451-52. During summation, trial counsel used the ME's testimony

to argue that being head-butted was "not a life threatening thing." T.553. Since trial counsel sought to persuade the jury that Petitioner had no involvement in causing Merced's death, and that the killers were Mogavero and Sage, it was not unreasonable for him to try to distance Petitioner's conduct as much as possible from Mogavero's. Stated another way, it was not unreasonable for counsel to decide that requesting an accomplice charge under C.P.L. § 60.22[4] might have undermined to such a strategy. "The fact that trial counsel's chosen strategy [of not asking for an accomplice charge] was ultimately unsuccessful does not render his performance objectively unreasonable." Valerio v. Phillips, No. 02-CV-901, 2008 WL 305007, at *16 (W.D.N.Y. Feb. 1, 2008) (rejecting ineffective counsel claim for not requesting accomplice charge, where "trial counsel's aim from the outset was to distance his client from" the alleged accomplice, and finding that requesting accomplice charge "would have had the opposite  effect and thus was counter to the defense strategy"); see also Moreau v. Ercole, No. 08-CV-1545(ARR), 2011 WL 1741824, at *8 (E.D.N.Y. May 2, 2011) ("[C]ounsel made an affirmative, strategic decision to request that an accomplice

---

4

If a jury determines that a prosecution witness "may reasonably be considered to have participated in: (a) the offense charged; or (b) an offense based upon the same or some of the same facts or conduct which constitute the offense charged" then the defendant "may not be convicted of any offense upon the testimony [such] accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense[.]" N.Y. CRIM. PROC. LAW § 60.22.

corroboration charge not be given, and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' <u>Strickland</u>, 466 U.S. at 690. Petitioner had testified that he didn't know Allen and had nothing to do with the arson. His counsel evidently felt that it would undercut his version of the events to instruct the jury that he and Allen were accomplices.") (internal citation to record omitted).

Petitioner has brought to the Court's attention the fact that his co-defendant, Sage, had his conviction for first-degree manslaughter reversed in a five-two decision by the New York Court of Appeals because the trial court failed to give a requested jury instruction on accomplice testimony. <u>See</u> <u>People v. Sage</u>, 23 N.Y.3d 16 (2014), <u>rev'g</u> <u>People v. Sage</u>, 98 A.D.3d 1254 (4th Dep't 2012). In <u>Sage</u>, defense counsel requested that the jury be given New York's "accomplice as a question of fact" jury instruction with respect to Mogavero, arguing that Mogavero's testimony raised a question of fact as to his involvement in Merced's murder. The prosecutor opposed the request, arguing that there was insufficient evidence that Mogavero had acted as an accomplice, and that he did not receive a benefit for testifying. The trial court denied Sage's request, and the Fourth Department affirmed. The sole issue before the New York Court of Appeals therefore was whether the trial court committed reversible error by denying defense counsel's request to

-16-

issue an accomplice-in-fact charge pursuant to C.P.L. § 60.22; Sage did not involve the relevant question before this Court, i.e., whether defense counsel was ineffective for failing to request such a charge. These two claims, and the legal standards applicable to them, are separate and distinct. Under New York law, if an accomplice-in-fact instruction is requested, it is "properly denied only if there is no reasonable view of the evidence that the witness 'participated in an offense based upon some of the same facts or conduct which make up the offense on trial[.]'" People v. Gumbs, 868 N.Y.S.2d 29, 32 (1st Dep't 2002) (quoting People v. Berger, 52 N.Y.2d 214, 219 (1981)). The decision by trial counsel whether or not to request a particular jury instruction is generally considered a strategic or tactical matter. See, e.g., People v. Colville, 979 N.E.2d 1125, 1126 (N.Y. 2012) ("[T]he decision whether to seek a jury charge on lesser-included offenses is a matter of strategy and tactics which ultimately rests with defense counsel."); People v. Fabricio, 763 N.Y.S.2d 619, 621 (1st Dep't 2003) ("[E]ven if defendant had been entitled to . . . a charge [on the affirmative defense to felony murder], there was a legitimate tactical basis for declining to request it, since it could have undermined defendant's main strategy."). Accordingly, the Court finds that Sage is inapposite. Furthermore, Sage was decided a year after the Court of Appeals denied leave to appeal in Petitioner's case, and about eight years after Petitioner's trial.

It therefore is of limited, if any, relevance to an assessment of trial counsel's performance, which must be based on a "consider[ation of the] the circumstances counsel faced at the time of the relevant conduct and . . . evaluate[d]. . . from counsel's point of view." Davis v. Greiner, 428 F.3d 81, 88 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 688-89) (first ellipsis in original).

Petitioner also relies on Lankford v. Arave, 468 F.3d 578 (9th Cir. 2006), in which the habeas petitioner's trial counsel requested, and the jury received, instructions on accomplice corroboration that were "not only inconsistent with" each other but one instruction was "an incorrect statement of Idaho law." Id. at 583. In Lankford, the jury, based on the charges requested by defense counsel, affirmatively "was instructed to overlook the question of corroboration." Id. at 588. The Ninth Circuit found that "[c]ounsel's errors with the jury instructions were not a strategic decision" but were "the result of a misunderstanding of the law[,]" id. at 584 (citation omitted). The Ninth Circuit found counsel's error "constitutionally inexcusable[,]" since "[b]y inviting a jury instruction that misstated state law and made it *easier* for the jury to convict his client, counsel unwittingly undermined the very 'adversarial testing process' he was supposed to protect." Id. at 585 (quoting Strickland, 466 U.S. at 688; emphasis in original).

Lankford is a far cry from Petitioner's case, both on the law and the facts. Lankford's petition pre-dated AEDPA and therefore was not governed by Section 2254(d)(1)'s deferential standard of review. Lankford, 468 F.3d at 583. Unlike this case, which involves a jury instruction omitted based on considered trial strategy, Lankford concerned a patently erroneous jury instruction requested out of ignorance by defense counsel. Moreover, the instruction in Lankford was practically guaranteed to be prejudicial, given that the accomplice's testimony was the only testimony singling out the petitioner as the killer, and there were no eyewitnesses to the crime. See id. at 586 ("It is hard to imagine a case in which such an instructional error could have caused more damage. . . ."). A seasoned attorney represented Petitioner, while in Lankford, the petitioner, who faced capital charges, was represented by a lawyer who had only tried one major felony (cattle rustling), and who delivered no opening statement, called no witnesses, did not secure a second attorney, an investigator (except for a fingerprint analyst), an independent pathologist, or an independent psychologist. Id. at 585 n.3.

As the Supreme Court has explained, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Richter, 562 U.S. at 111. Here, trial counsel mounted a cogent attack on the credibility of chief prosecution witness Mogavero, eliciting on cross-examination

that Mogavero understood he would not be prosecuted for murder or any other crime. T.323. Trial counsel also obtained several admissions from Mogavero helpful to Petitioner's case, namely, that Mogavero had helped Merced out of Velez's apartment, fled to Sage's apartment without calling 911 on his cell phone, stayed at Sage's apartment for several hours after the incident, and changed out of the clothes had been wearing at the time of the assault. See T.308-10, 323, 328-29, 332. To undermine Mogavero's testimony that he saw Petitioner stomp on Merced's head and drop a large stereo speaker on him, trial counsel elicited from defense witness Velez that no one inside his apartment engaged in such conduct, and that outside the apartment, it was Mogavero who stomped on Merced's head while Sage struck Merced with a mop handle. T.491-93. Trial counsel presented evidence suggesting that Sage also may have stomped on Merced by means of defense witness Manza who testified that the person whom she saw stomping on the victim appeared to be wearing "Timberland boots." T.465. Trial counsel elicited from Investigator Cassidy that the police seized a pair of boots from Sage's apartment. T.376-78.

Trial counsel highlighted the absence of blood on the carpet in Velez's apartment or on the stereo speakers, and argued that Mogavero's testimony about Petitioner dropping the speaker on Merced's head was a "tale" that "just did not happen." T.552-53. The Court notes that trial counsel's strategy resulted in the jury

returning a not-guilty verdict on the second-degree murder count, the most serious charge facing Petitioner. Although counsel did not obtain an outright acquittal, courts have found that counsel's securing of an acquittal on the top count to be indicative of effective representation. See, e.g., Mills v. Lempke, No. 11-CV-0440 (MAT), 2013 WL 435477, at *22 (W.D.N.Y. Feb. 4, 2013) ("[T]he record demonstrates that Mills' pre-trial and trial attorneys were effective overall, mounting a consistent and cogent defense that there was insufficient evidence of intent for the most serious criminal charges due to Petitioner's mental health issues, intoxication, and marijuana use. Notably, the jury was persuaded to acquit Petitioner on several of the top counts of the indictment[.]"); People v. Ennis, 11 N.Y.3d 403, 412 (2008) ("Defense counsel performed as an effective advocate in many significant respects. He vigorously cross-examined the People's witnesses, gave a strong closing argument, and succeeded in obtaining acquittals on the most serious charges facing defendant[.]"). In sum, the Fourth Department did not apply Strickland in an objectively unreasonable manner in ruling that trial counsel did not perform deficiently in declining to request a jury charge under C.P.L. § 60.22.

### 2.    The "Prejudice" Prong

A court is not required to address the two prongs of the Strickland test prongs in any particular order because a finding

that a petitioner has failed to satisfy one prong obviates the need to consider the other. See Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [a particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Having found that Petitioner is unable to demonstrate that trial counsel's performance was inadequate, the Court need not consider Strickland's "prejudice" prong.

## V.   Conclusion

For the foregoing reasons, the Court denies Petitioner's request for a writ of habeas corpus. The petition (Dkt #1) is dismissed.  The Court declines to grant a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
   HON. MICHAEL A. TELESCA
   United States District Judge

Dated:    October 19, 2015
          Rochester, New York.